IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CHARLES JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 4:20-cv-00179 |
| THEHUFFINGTONPOST.COM, INC.,, | ) |
| | ) **JURY DEMANDED** |
| Defendant. | ) |
| | ) |
| | ) |

**RESPONSE TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

Plaintiff Charles Johnson ("Johnson" or "Plaintiff") hereby responds to Defendant TheHuffingtonPost.com, Inc.'s ("HuffPost" or "Defendant") Motion to Dismiss First Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted ("Motion", Doc. 33) and would respectfully show the Court as follows:

### **THE MOTION IS IMPROPER AND VIOLATES THIS COURT'S ORDER**

On March 10, 2020, this Court issued an Order specifically admonishing the parties **not** to file motions styled as FRCP 12(b)(6) motions when they are reliant on evidence outside the pleadings and concern disputed fact issues. *See generally* Doc. 17. The Court instructs counsel that such motion practice will not permitted to allow a strategic advantage of counsel to seek summary judgment under the auspices of Rule 12 motion practice. *Id.* That Order further reminds counsel that by filing a motion that is, in essence, one for summary judgment, counsel is representing in accordance with FRCP 11, that there are no genuine disputes of material fact. *Id.*

1

Plaintiff objects to the consideration of Defendant's motion for summary judgment inappropriately masquerading as a "Rule 12(b)(6)" motion. Plaintiff objects to the consideration of evidence outside the pleadings. To the extent the Court is inclined to convert the Motion to a motion for summary judgment, Plaintiff requests that fair notice be given and a full opportunity to conduct reasonable discovery be granted prior to responding to the Motion and the Court considering the Motion. *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013); *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008); *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 184 F.3d 280, 287–88 (3d Cir. 1999); *Arnold v. Air Midwest, Inc.*, 100 F.3d 857, 859 n.2 (10th Cir. 1996).

The Motion seeks the Court to rule as a matter of law—among other things—on (1) the impression/gist/meaning of the Article; (2) the substantial truth of the Article; (3) whether Plaintiff is a public figure; and (4) whether Defendant acted with actual malice.

Plaintiff contends there are genuine questions of material fact on the following issues that Plaintiff requires discovery on:

a. How the ordinary reader perceived the statements made by the Article and the perceived gists of the Article. As discussed herein, the Court must read the Article from the standpoint of the hypothetical ordinary reader or "person on the street". When the reading of a publication involves a dispute over whether there is a false statement made by implication, the Court may consider reader response surveys to determine what the gist of the publication is. *See, e.g., American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165-66 (2d Cir. 1978) (holding that surveys of readers may demonstrate readers gleaned false impression even in absence of no literally false statement). Plaintiff will provide expert testimony that the Article was read by the ordinary reader as he pleads in his Amended Complaint.

    b.   Whether statements made in the Article are substantially true. This is a fact question.

    c.   Plaintiff will also conduct discovery on to what extent the Defendant was aware of Plaintiff, to what extent Plaintiff was publicly known, and to what extent Plaintiff was involved in any "controversies" prior to the Article. This is relevant to Defendant's claim that Plaintiff was a public figure.

    d.   Plaintiff will further conduct discovery as to the state of mind of all personnel involved in the publication of the Article, their verification process, their internal communications, and their animus toward right-wing politics and Plaintiff.

As such, Plaintiff requests that the Court either deny the Motion outright or, if the Court converts the Motion to a summary judgment, to defer ruling until after such time that reasonable discovery can be completed. Otherwise, Plaintiff's Fifth and Fourteen Amendment Due Process rights would be violated as well as his Seventh Amendment right to a jury of his peers determining triable issues of fact such as meaning of the Article, his public figure status, and actual malice. Plaintiff objects to consideration of the Motion on this basis.

## THE LEGITIMATE 12(b)(6) GROUNDS

The Motion also argues that it should succeed on the basis that the statements complained of are protected under Texas Civil Practice & Remedies Code Section 73.005 (and thereby, consenting to Texas jurisdiction). *See* Doc. 33 at pp. 13-15. In addition, the Motion argues that the statements complained of are non-actionable opinion. *Id.* at pp. 9-12. These are the only two arguments raised in the Motion that might be properly raised in a Rule 12(b)(6) Motion as they could potentially be determined as pure questions of law from the pleadings.[1] Plaintiff otherwise responds to the Motion

---

[1] As noted above, the Motion also makes arguments that the statements complained of in the Article are not capable of the meaning ascribed of by Plaintiff and that Plaintiff is a public figure, thus invoking the actual malice standard that Plaintiff can allegedly not satisfy. *See generally* Doc. 33. As discussed in the preceding section, these are fact issues that require discovery making determination under Rule 12(b)(6) inappropriate.

3

as follows:

## ARGUMENT AND AUTHORITIES

Notwithstanding these arguments, out of abundance of caution, Plaintiff responds in substance where possible as follows:[2]

A motion to dismiss for failure to state a claim upon which relief can be granted under FRCP 12(b)(6) tests the formal sufficiency of the plaintiff's statement of its claim for relief in its complaint. *See Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). The motion cannot be used to resolve factual issues or the merits of the case. *Id*. A motion to dismiss under FRCP 12(b)(6) is appropriate only if the plaintiff has not provided fair notice of its claim and factual allegations that—when accepted as true—are plausible and rise above mere speculation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Motions to dismiss for failure to state a claim are viewed with disfavor. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

The defendant should not attach affidavits, evidence, or other extrinsic materials to the motion and the motion must be decided solely on the allegations in the plaintiff's complaint. *Speaker v. U.S. Dept. of H&HS Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010); *see* Fed. R. Civ. P. 12(d). If the court considers extrinsic evidence, the FRCP 12(b)(6) motion must be converted into a motion for summary judgment. *Speaker*, 623 F.3d at 1379; see FRCP 12(d); *Weise v. Casper*, 507 F.3d 1260, 1267 (10th Cir. 2007). If this occurs, then the Court should give proper notice and allow for reasonable discovery prior to ruling on the motion. *See* discussion *supra* at p. 2.

### I. The Article States What Plaintiff Alleges Either Expressly Or By Implication.

---

[2] Defendant engages in nothing short of a smear campaign to assassinate Plaintiff's character by making false claims and taking statements out of context in pages 1-5 in the "Introduction" and "Factual Background" sections of the Motion. Plaintiff will not respond to these baseless and distorted accusations and the "sources" cited for them as they are irrelevant to any issues that would properly be the subject of a Rule 12(b)(6) motion.

Defendant's Motion complains that the Article does not expressly state that Plaintiff is a white supremacist or anti-Semitic. *See* Doc. 33 at pp. 7-8. Defendant also argues that Plaintiff's contention that the Article gives the false impression that Johnson was attempting to influence state officials to utilize DNA sequencing and/or genetic science to cause harm or oppression to minority groups. *See id.* Defendant requests dismissal under Rule 12(b)(6) on this basis. *See id.*

Under Texas law, a publication is capable of defamatory meaning if, in light of context and surrounding circumstances, "from the point of view it would have on the mind of ordinary readers," the publication tends to injure the reputation of a person or impeach any person's honesty, integrity, or virtue. *Sellards v. Express-News Corp.*, 702 S.W.2d 677, 679 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.); TEX. CIV. PRAC. & REM. CODE § 73.001. This determination is not made from the standpoint of the "careful reader" or the "literal reader", but from the viewpoint of the person "on the street's" ordinary and reasonable reading. *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 119 (Tex. 2000) (citations omitted). This hypothetical "person of ordinary intelligence" is one who exercises care and prudence, but not omniscience, when evaluating an allegedly defamatory communication. *See New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004).

To determine the Article's meaning and, ultimately, whether it is true or false, the Court must first determine its gist or gists. *Neely v. Wilson*, 418 S.W.3d 52, 63 (Tex. 2013). The Article's gist or gists is based on "a reasonable person's perception of the entirety of [the Article] and not merely on individual statements." *Turner*, 38 S.W.3d at 115. Under Texas law, courts "do not engage in 'a technical analysis' of each statement in isolation, but consider the publication as a whole[.]" *Neely*, 331 S.W.3d at 914-15 (quoting *New Times, Inc.*, 146 S.W.3d at 154).

As pleaded in his Amended Complaint, Plaintiff contends that—regardless of the overt statements in the Article—the gists of the Article include assertions that Plaintiff is anti-Semitic and a white supremacist. *See* Doc. 25 at ¶¶ 7-11. Anyone with a basic reading comprehension level can

5

read the Article (Ex 1 to Doc. 33) with the headline that "*2 GOP Lawmakers Host Chuck Johnson, Holocaust-Denying White Nationalist*" and the subtitle that "*Reps. Andy Harris and Phil Roe discussed 'DNA sequencing' with Johnson, just after the House disavowed white supremacy*" and take away that the clear import is that Johnson is being implicated as a white supremacist and anti-Semitic. Besides the headline that refers to Plaintiff as a white nationalist and Holocaust denier, the Article states:

> Two Republican congressmen met with noted Holocaust denier and white nationalist Chuck Johnson to discuss "DNA sequencing," less than a day after the House voted to disavow white supremacy and white nationalism[.]
>
> [The lawmaker] told the Daily Beast he was "unaware of [Johnson's] previous associations."
>
> "Of course I disavow and condemn white supremacy and anti-semitism," his statement said.
>
> Roe's office said the lawmaker met with Johnson to discuss "what seemed like legitimate information" about "DNA sequencing."

The clear import of these statements, juxtaposed with all of the other claims regarding Johnson (the way *Neely* admonishes courts to read a publication), is that he is, in fact, a white supremacist and anti-Semite.

Furthermore, the Article clearly casts the inference that there is some connection between Plaintiff's alleged white supremacy, anti-Semitism, white nationalism, and Holocaust denial and Plaintiff's meeting with the lawmakers to discuss DNA and genetics. And while the Article states that Johnson "advocated for more publicly-available sequenced genomes" it also juxtaposes this statement with the lawmaker's statement that it "*seemed*" like legitimate information and that:

> Some white nationalists have become obsessed with genetics; most recently, prominent alt-right figures began co-opting white milk as a symbol for white supremacy, pointing to misleading and misguided genetic studies implying that people of color are more likely to report lactose intolerance. White supremacists also have been flocking to genetic ancestry tests to prove their white heritage — sometimes with mixed results.

The import of these statements, their context, and juxtaposition leaves no doubt to the ordinary reader that: (1) there was likely a discussion of genetic sequencing that had to do with race/ethnicity

and/or (2) Plaintiff was attempting to influence state officials to utilize DNA sequencing and/or genetic science to cause harm or oppression to minority groups. If this was not the case, then why is there is a story here to begin with? The alarmist tone of the Article is clearly based on a connection between a disciple (Plaintiff) of "white supremacy/white nationalism"—an ideology obsessed with DNA/genetics--and his meeting with lawmakers to discuss DNA/genetics. The Article's gist is clearly to alarm the reader that people who believe in white supremacy based on DNA/genetics are meeting with lawmakers in attempts to further their racist/Nazi agenda.

If this were not the case, then there is no reason to even report on Plaintiff's meeting. For example, imagine the headline read "*2 GOP Lawmakers Host Johnny Q. Public, Pedophile*" and the subtitle that "*Reps. John Doe and Jack Doe discussed Age of Consent Laws with Public, just after the House disavowed pedophilia*". Without even getting into the substance, the reader would immediately be alarmed that lawmakers were meeting with a pedophile to discuss age of consent laws because of the clear implication that the reason why this even being reported as "news" is because a reputed pedophile is attempting to influence lawmakers on the age of consent to advance his perverted agenda. Analogously, here, the whole purpose of the Article is to convey the message that someone who believes in genetic superiority of certain people over others has met with lawmakers on the issue of genetics to further his nefarious purposes. The gist of the Article is clearly that Plaintiff is a white supremacist who meets with lawmakers in attempts to further his ideology of genetic superiority. Defendant's arguments to the contrary are disingenuous and unreasonable readings of the Article.

Defendant relies on *Cox Media Grp., LLC v. Joselevitz*, 524 S.W.3d 850, 863 (Tex. App.—Houston [14th Dist.] 2017) for the proposition that because the paragraph of the Article discussing the white supremacy/genetics connection does not explicitly referent Plaintiff, then it cannot create an inference that this connection was involved in Plaintiff's meeting with the lawmakers. *Cox Media* dealt with an article that discussed the general problem of physicians over-prescribing pain

medications and the effects on society. *See generally id.* The plaintiff was referenced for having a patient who had overdosed of medication in one part of the article, and the issue of "pill mill" pain centers was discussed in another where the plaintiff was not referenced. In holding that that article could not give rise to an inference that the plaintiff ran a pill mill, the *Cox Media* court noted that "[t]he discussion of the pill-mill legislation is a topic distinct from the discussion of [plaintiff]". *See id.*

Here, however, Plaintiff is the centerpiece of the Article. The headline specifically links Plaintiff's alleged white supremacy/white nationalism with discussions of DNA/genetics with lawmakers. The topic of white supremacy/white nationalism is not distinct from the discussion of Plaintiff – they are one in the same. The paragraph discussing the "obsession" by white racists with genetics is simply not a stand-alone discussion. It is the background necessary for the reader to understand why the reader should be alarmed by Plaintiff—a white racist—meeting with lawmakers to discuss DNA. As such, *Cox Media* is inapposite to this case.

Finally, in their Motion, the Defendant *admits* that this is gist and main idea of the Article. On page 14 of the Motion, Defendant argues that "the subject of the Article is a matter of public concern, as **it centers on matters of national politics and Plaintiff's attempt to influence them**." Thus, by Defendant's own admission, the gist of the Article is that a white nationalist/supremacist racist is attempting to influence national politics to fit his racist agenda through the use of DNA/genetic sequencing.

Moreover, if there is any ambiguity as to this meaning—that some readers could read it Defendant's way and some Plaintiff's way—then this question must go to the jury. *See, e.g.*, *Turner*, 38 S.W.3d at 117; *Sellards*, 702 S.W.2d at 679 (holding that if the statements at issue in the publication are ambiguous, in that they may have a defamatory meaning, but are not necessarily defamatory, then the issue must be submitted to the jury and the trial court may not grant summary judgment) (citations

omitted).

Accordingly, the Motion should be denied on this point.

## II. The Complained Of Portions Of The Article Are Not Opinions.

In its Motion, Defendant argues that the complained of statements that accuse Plaintiff of being a white supremacist, Holocaust denier, white nationalist, and anti-Semite are non-actionable statements of opinion. *See* Doc. 33 at 9-12. Defendant argues for dismissal of Plaintiff's libel claim on this basis. *See id.*

First, as discussed above, Plaintiff's claim is not simply based on being accused of being a white supremacist, Holocaust denier, white nationalist, and anti-Semite, but also based on the Article's false impression that somehow Plaintiff was attempting to influence lawmakers with DNA and/or genetic technologies to harm non-whites and/or Jews. *See* Doc. 25 at ¶¶ 7-15. Of course, there is absolutely no evidence of this and this is false, but the Article conveniently leads the reader to this conclusion by the purposeful omission of these facts so as to make Johnson appear as not just a racist, but a *dangerous* racist who seeks to "take out" non-whites and Jews through influencing elected officials with DNA sequencing and genetic research. *See* Ex. 1 to Doc. 33. The Article completely fails to disclose these important facts regarding the meeting between Plaintiff and the lawmakers and therefore cannot justifiably convey any "opinion" to the reader in this regard. Thus, the complaint is not simply that Plaintiff was called names, but that, in conjunction with being called names, it was suggested that he was attempting to influence state officials to utilize DNA sequencing and/or genetic science to cause harm to minority groups. The Motion makes absolutely no argument in this regard. *See generally* Doc. 33. As such, the Motion should be denied on this basis alone since it fails to even address the gist of Plaintiff's claim.

Second, and notwithstanding the selected authorities cited in the Motion, let us consider the import of what Defendant is contending. Defendant tells us that whether someone is a white

9

nationalist, white supremacist, Holocaust denier, or anti-Semite is not objectively verifiable because it deals with the subjective beliefs of the Plaintiff. So sending people to death row based on their subjective belief (pre-meditation), convicting people of hate crimes (animus toward another group), and finding someone guilty of race-based discrimination—all of which are routinely done in our country sometimes under a "beyond a reasonable doubt" standard—are all capable of "fact findings" by a jury or judge. A defamation plaintiff, however, is simply incapable, as a matter of law, of proving his or her mental state. This, despite the fact that one of the elements of defamation in a public figure case is the mental state of the defendant – negligence or actual malice. Defendant advances a truly bizarre legal standard.

Moreover, Defendant's contention essentially admits that whenever a media outlet refers to someone as a racist or equivalent term, that this is not factual. Therefore, there can never be "reporting" on issues of racism and hate since that—by definition—cannot be fact-based reporting. There can only be opinion pieces and editorializing on these issues.[3] Americans would surely be shocked to learn that the existence of racism, Nazism, white supremacy, white nationalism, and anti-Semitism are on equal footing with Bigfoot, extra-terrestrials, and the Loch Ness Monster. They are all incapable of being proven true or false. Taken to its logical conclusion, Defendant's position would lead one to the conclusion that Adolph Hitler cannot be "proven" to be anti-Semitic, since such truth claims only rest in the realm of opinion – not fact.

However, the Court need not address these issues because Plaintiff has amended his Complaint to make clear he not complaining regarding simply being called names, but for proactively seeking to carry out racist/genocidal activities. However, to the extent the Court does not accept this construction

---

[3] And to be sure, the Article is not in any way styled as an "opinion" piece. It is styled as a news report. *See* Ex. 1 to Doc. 33.

of the Article to bear this meaning, Plaintiff contends that, in the context of the Article and how the terms are used, the terms white supremacist, Holocaust denier, white nationalist, and anti-Semite are objectively verifiable terms. The Motion should be denied on this point.

### III.     The Article Is Not Substantially True.

Defendant further argues for dismissal on the grounds that the Article is substantially true. Doc. 33 at pp. 12-13. First, whether the Article is substantially true is a question of fact that will depend on evidence outside the pleadings. Therefore, it is completely inappropriate to determine this on a Rule 12(b)(6) motion. For example, in *Morris v. Dallas Morning News, Inc.*, the court concluded that a police officer who was reported to have beaten a suspect could survive a substantial truth motion for summary judgment on the grounds that the court "must accept Officer Morris' depiction of his thought processes at the time as the truth." *See* 934 S.W.2d 410, 417 (Tex. App.—Waco 1996, writ denied). The officer stated that he intended only to subdue the victim, not injure him. *See id.* Here, in his Amended Complaint, Plaintiff has alleged the meeting with lawmakers had nothing to do with race or ethnicity and he is not a white supremacist, white nationalist, an anti-Semite, or Holocaust denier. *See generally* Doc. 25. Defendant even corrected the Article to clarify this. *See* Doc. 33 at Ex. 1. The Court must take those allegations as true. As such, the Motion should be denied.

Second, just like with the Opinion argument, the Motion fails to address the gist of Plaintiff's claim, which is the Article suggests that somehow Plaintiff was attempting to influence lawmakers with DNA and/or genetic technologies to harm non-whites and/or Jews. *See* Doc. 25 at ¶¶ 7-15. Therefore, the Motion fails to even address the alleged substantial truth of the main defamatory implication that Plaintiff complains of.

Finally, the Motion's ridiculous assertions demonstrate the need to hold the media accountable for, for example, weaponizing terms like "anti-Semite" to willy-nilly apply to anyone who has a dissenting viewpoint from orthodox beliefs regarding the Second World War. In the Motion,

Defendant argues that it is "anti-Semitic and Holocaust denialism to claim millions of Jews were not murdered in gas chambers." Doc. 33 at p. 13. This is preposterous. What does questioning the numbers of Jewish victims and the causes of death of those victims in the Second World War at the hands of the Nazis have to do with hating or disliking Jewish people? This Orwellian view by Defendant would be likened to a historian that disputes the number of victims of the Armenian genocide at the hands of the Ottoman Turks being deemed "anti-Armenian". The Motion illustrates just how irresponsible the *Huffington Post* is with weaponized and reputation destroying terms and how it will use them against persons with opposing political viewpoints to suit their agenda.

The Motion should be denied on this point.

### IV. Texas Civil Practice & Remedies Code Section 73.005 Is Inapplicable.

Defendant next argues that Plaintiff's claims must be dismissed because he complains of matters that are expressly privileged under Texas Civil Practice & Remedies Code Section 73.005. *See* Doc. 20 at 12-14. That provision provides that newspapers cannot be sued for accurately "reporting of allegations made by a third party". *See* TEX. CIV. PRAC. & REM. CODE § 73.005(b).

First, these arguments cannot apply to the guts of Johnson's defamation claim as flushed out in the Amended Complaint, which is that the Article gives the false defamatory impression that Johnson was attempting to influence state officials to utilize DNA sequencing and/or genetic science to cause harm to minority groups. *See generally* Doc. 25. These impressions are not attributed to any sources via hyperlink or otherwise. These impressions are uniquely created by the Article and nothing else. As such, the Motion should be denied on this basis alone.

Second, to the extent that Plaintiff complains of other specific statements in the Article that are not attributable to sources, Defendant argues that hyperlinks embedded in certain of those statements immunize Defendant from liability. Specifically, Defendant points to these specific statements that Plaintiff complains of:

> [Johnson] also questions how many Jewish people were killed in the Holocaust, ran a crowdfunding site for white supremacists and neo-Nazis, said "anti-racist is anti-white," was kicked off Twitter for threatening to "take out" a Black Lives Matter activist and suggested an Amtrak crash was caused by the engineer's sexuality.

These statements are asserted as objectively verifiable statements of fact, with no qualifying language attributing them to any sources. Therefore, they do not qualify for protection under Tex. Civ. Prac. & Rem. Code § 73.005(b). *See also* Restatement (Second) of Torts § 611 (consistently prefacing the privileged matters with "report of").

Defendant, however, argues that the inclusion of hyperlinks in the above-referenced statements are sufficient to invoke the protections of Tex. Civ. Prac. & Rem. Code § 73.005(b). *See* Doc. 33 at 13 n.10. Defendant cites no Texas cases, but does cite one case from Nevada for the proposition that including hyperlinks alone is sufficient to alert the ordinary reader that the statements made in the Article are "reports" of third-party allegation. That case is *Adelson v. Harris*, 133 Nev. 512, 518 (Nev. 2017). In *Adelson*, one of the alleged defamatory statements recited that the defamation plaintiff "'reportedly approved of prostitution' at his Macau casinos and included a hyperlink to an Associated Press (AP) article discussing ongoing litigation[.]" *See id.* at 513. In addition, another series of statements stated that "reports surfaced that in addition to his anti-union and allegedly corrupt business practices, Adelson 'personally approved' of prostitution in his Macau casinos." (Underlines represent active hyperlinks at the time the statements were published.) *See id.* at 514. Thus, in *Adelson*, the hyperlinks were accompanied by prefatory language such "reportedly" or making clear that the claims were "reports" and not the author's independently-warranted assertions of factual truth. This is not the case here, where the Article makes the factual assertions with no language attributing them to sources. *See* Doc. 20 at Ex. 1.

Defendant also cites *Gubarev v. Buzzfeed, Inc.*, 340 F. Supp. 3d 1304, 1318-1319 (S.D. Fla. 2018), which discusses *Adelson*. However, that case is also unhelpful to Defendant because in

13

*Gubarev*, like in *Adelson*, the hyperlinked material is prefaced with "CNN reported". *See id.* at 1319. Therefore, the hyperlinks in the Article are ineffective to flag for the reader that the words "reportedly" should be superimposed or implied in the statements complained, which are on the contrary to the articles in *Adelson* and *Gubarev* where such hyperlinks contain the requisite prefatory language to avail themselves of the fair report privilege.

For all of these reasons, the Motion should be denied on this issue.[4]

## V. Plaintiff Is Not A Public Figure, But Can Show Actual Malice.

Finally, Defendant argues that Plaintiff is a limited purpose public figure and cannot plead or prove actual malice. *See* Doc. 33 at pp. 15-20.

First, Plaintiff disputes that he is a public figure of any sort and objects to the determination of this issue prior to discovery being taken and at the Rule 12(b)(6) stage as discussed above. Defendant points to the fact that Plaintiff has been involved in conservative political causes and has occasionally engaged with the media. *See id.* However, as the Article itself concedes, Plaintiff was not known or recognized by the two Republican congressmen. *See* Ex. 1 to Doc. 33. But more importantly, the Motion fails to identify any specific public controversy that Plaintiff supposedly injected himself into. Defendant essentially argues that Plaintiff is a general purpose public figure for all issues pertaining to racism and anti-Semitism.

However, this is not the way the limited purpose public figure doctrine works. Plaintiff must have injected himself into an actual public controversy that is the topic of discussion in the Article. The gist of the Article (as complained of by Plaintiff) is that the Article gives the false impression that

---

[4] Defendant also argues it is Plaintiff's "burden" at the "pleadings stage" to demonstrate that the accusations in the Article are "not substantially true", citing *Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 380 (Tex. 2019). Defendant misleads the Court. *Hall* was decided under the Texas Citizens' Participation Act ("TCPA"), which is the Texas anti-SLAPP procedural scheme and places different pleading standards and initial burdens on plaintiffs than the Federal Rules of Civil Procedure. *See id.* The TCPA has no applicability in federal court and thus *Hall's* holding referenced by Defendant is irrelevant to the Court's determination of the Motion.

Johnson was attempting to influence state officials to utilize DNA sequencing and/or genetic science to cause harm to minority groups. *See generally* Doc. 25. There is no evidence that there was any such controversy until the Article was published. The Article cannot be the impetus for the controversy that allegedly gives rise to Plaintiff's public figure status. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) (noting that the subject of plaintiff's writings became matter of controversy only as consequence of defendant's action and proclaiming that, "[c]learly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.").

Here, Defendant argues that Plaintiff's commentary on "controversial alt-right politics and racially motivated rhetoric" make him a limited purpose public figure. *See* Doc. 33 at pp. 16-17. Assuming *arguendo* that this is true, this does not make him a limited purpose public figure for purposes of the gist of the Article. As stated above, Plaintiff's meeting with lawmakers to discuss DNA/genetic sequencing had nothing to do with either the "alt-right" or race. It was only Defendant's false suggestion to the contrary in the Article that created any controversy. Therefore, Defendant cannot demonstrate—certainly not on this record—that "the alleged defamation" is "related to the plaintiff's participation in the controversy." *See Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 433-34 (5th Cir. 1987). As such, Defendant's public figure argument must fail.

In addition, even if he were a public figure, Plaintiff has specifically pleaded plausible facts in his Amended Complaint that, if proven, would demonstrate actual malice by Defendant. *See* Doc. 25 at ¶¶ 13-14. In his Amended Complaint, Plaintiff has pleaded that Defendant failed to follow journalistic guidelines, failed to contact him to verify details, and had an injurious motive to turn a blind eye to the truth, which resulted in the purposeful omission of important facts from the Article. *See id.* Chiefly, the fact that Johnson's meeting with the legislators over DNA sequencing had nothing to do with race or ethnicity or had any connection to "white nationalism" or the like. *See id.*

These factual allegations, if proven, can constitute a finding of actual malice. For example, in *Curtis v. Butts*, where the reporter failed to follow "elementary" reporting guidelines, there was a fact issue of actual malice. 388 U.S. 130, 157-58 (U.S. 1967). In addition, in *Texas Disposal Sys. Landfill, Inc. v. Waste Mgt. Holdings, Inc.*, 219 S.W.3d 563, 579 (Tex. App.—Austin 2007, pet. denied) the court held that the defendant's "failure to independently verify any of the information to be indicative of actual malice." In addition, courts have likewise held that evidence of injurious motive is relevant for a factfinder to determine reckless disregard for truth. For example, in *Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002), the Texas Supreme Court held that "a desire to avoid the truth may demonstrate the reckless disregard required for actual malice". Here, Plaintiff has alleged that Defendant's left-leaning agenda has created a malice toward the truth to create a false narrative that Plaintiff is a racist boogeyman plotting with Congress to employ genetic/DNA technologies against people of color, which is a bald-faced lie.

In the Motion, Defendant cites cases that evidence of these factors "alone" may not give rise to actual malice. However, these cases do not hold that these factors are not *relevant* and *probative* of actual malice as to the aggregate proof a plaintiff may present at trial. As the cases above demonstrate, these are relevant factors, which—when weighed together—are sufficient to demonstrate actual malice to the truth of the publication.

Plaintiff intends to prove all of those allegations in this case at the appropriate time and after discovery has ensued. As such, the Motion should be denied on this point.

## CONCLUSION

Plaintiff requests that that Court deny the Motion. To the extent that the Court converts the Motion to a summary judgment, Plaintiff requests the Court give proper notice and opportunity to conduct reasonable discovery. To the extent the Court grants the Motion, Plaintiff requests leave to replead to cure any deficiencies.

CAMARA & SIBLEY LLP

/s/ Joseph D. Sibley
Joseph D. Sibley
State Bar No. 24047203
sibley@camarasibley.com
Camara & Sibley LLP
4400 Post Oak Pkwy.
Suite 2700
Houston, Texas 77027
Telephone: (713) 966-6789
Fax: (713) 583-1131

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document has been filed on this 14th day of May, 2020, pursuant to the electronic filing requirements of the United States District Court for the Southern District of Texas, which provide for service on counsel of record in accordance with the electronic filing protocols in place.

*/s/ Joseph D. Sibley*
Joseph D. Sibley