United States Courts
Southern District of Texas
FILED

*May 05, 2022*

Nathan Ochsner, Clerk of Court

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 23, 2021

Lyle W. Cayce
Clerk

No. 21-20022

Charles Johnson,

*Plaintiff—Appellant,*

*versus*

TheHuffingtonPost.com, Inc.,

*Defendant—Appellee.*

Appeal from the United States District Court
for the Southern District of Texas
No. 4:20-CV-179

Before King, Smith, and Haynes, *Circuit Judges.*

Jerry E. Smith, *Circuit Judge*:

Charles Johnson says the Huffington Post ("HuffPost") libeled him by calling him a white nationalist and a Holocaust denier. He sued HuffPost in Texas. HuffPost is not a citizen of Texas and has no ties to the state. But its website markets ads, merchandise, and ad-free experiences to all comers.

We must decide whether those features of HuffPost's site grant Texas specific personal jurisdiction over HuffPost as to Johnson's libel claim. They do not, so we affirm the dismissal and deny jurisdictional discovery.

No. 21-20022

## I.

HuffPost is a website that publishes online articles and commentary. It's perhaps best known for its political coverage.

About three years ago, HuffPost reported that Johnson had met with two congressmen in Washington, D.C.  The story identified Johnson as a "noted Holocaust denier and white nationalist."  The story said nothing about Texas, nor did it rely on sources based in Texas or recount conduct that occurred in Texas.

Displeased with the portrayal, Johnson sued HuffPost for libel in the Southern District of Texas.  At first, Johnson based jurisdiction on his Texas citizenship and said that the libel had occurred in Texas.  But HuffPost is a citizen of Delaware and New York; it has no physical ties to Texas; it has no office in Texas, employs no one in Texas, and owns no property there.

To surmount that barrier, Johnson's amended complaint stressed HuffPost's online links to Texas.  Johnson calls four to our attention. *First*, HuffPost's website, which displays the alleged libel, is visible in Texas. *Second*, HuffPost sells an ad-free experience[1] and merchandise to everyone, including Texans. *Third*, advertisers from Texas have contracted with Huff-Post to show ads on the site.  And *fourth*, HuffPost collects information about its viewers, including their location, to enable advertisers to show them relevant ads.  All those contacts, Johnson avers, establishes that HuffPost "has purposefully availed itself of the privileges of doing business in Texas."

HuffPost moved to dismiss for want of personal jurisdiction.  In a terse opinion, the district court granted that motion, noting that the story did not concern Texas, did not use Texas sources, and was not "directed at Texas

---

[1] Johnson calls this a "subscription."  But the record shows that HuffPost is free to read.  Readers may choose to pay for an ad-free experience.

No. 21-20022

residents more than residents from other states."

Johnson appeals. He urges that the district court erred by looking to the libel's effects in the forum state rather than to the features of HuffPost's website, which he says support jurisdiction in Texas. In the alternative, Johnson seeks discovery to support his jurisdictional claims.

HuffPost restates that it has no physical ties to Texas and that the story about Johnson does not target Texas or rely on Texas in any way. It also points out that Johnson's injury arises only from the story's visibility in the forum— not from ads, merchandise, or ad-free experiences. And if those ties sufficed, HuffPost warns, personal jurisdiction would become "universal jurisdiction," allowing suit anywhere its website is visible.

## II.

The dismissal was proper. Our precedents require affirmance.

## A.

We review the dismissal *de novo*. *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002). As plaintiff, Johnson has the burden of demonstrating our jurisdiction, *id.*, but we must accept his uncontroverted, non-conclusory allegations of fact, *Diece-Lisa Indus. v. Disney Enters.*, 943 F.3d 239, 249 (5th Cir. 2019).

Because we are sitting in diversity and applying Texas law, we have jurisdiction over a nonresident defendant only to the extent consistent with his federal due process rights. *Id.* Those rights permit our jurisdiction only where the defendant has established enough purposeful contacts with the forum and where jurisdiction would comport with "traditional notions of fair play and substantial justice." *Revell*, 317 F.3d at 470 (cleaned up).

Johnson argues that we have claim-specific jurisdiction over HuffPost. We have that jurisdiction only when three conditions are met. *Seiferth v.*

No. 21-20022

*Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). *First*, the defendant must "purposefully avail[ ] itself of the privilege of conducting activities in the forum State." *Ford Motor Co. v. Mont. Eighth Jud. Distr. Ct.*, 141 S. Ct. 1017, 1024 (2021) (cleaned up). The defendant's ties to the forum, in other words, must be ties that "the defendant *himself*" purposefully forged.[2] *Second*, the plaintiff's claim "must arise out of or relate to" those purposeful contacts.[3] A defendant may have many meaningful ties to the forum, but if they do not connect to the plaintiff's claim, they cannot sustain our power to hear it. *Third*, exercising our jurisdiction must be "fair and reasonable" to the defendant. *Seiferth*, 472 F.3d at 271.

Those limits "derive from and reflect two sets of values—treating defendants fairly and protecting interstate federalism." *Ford Motor*, 141 S. Ct. at 1025 (cleaned up). Put another way, a defendant must have "fair warning" that his activities may subject him to another state's jurisdiction. *Id.* That warning permits the defendant to "structure its primary conduct to lessen or avoid exposure to a given State's courts." *Id.* (cleaned up). The limits on specific jurisdiction also "ensure that States with little legitimate interest in a suit" cannot wrest that suit from "States more affected by the controversy." *Id.* (cleaned up).

## B.

In *Revell*, we explained how to apply those principles to cases in which a defendant's website is the claimed basis for specific jurisdiction vis-à-vis an intentional tort. We first look to the website's interactivity. *See Revell*,

---

[2] *Diece-Lisa*, 943 F.3d at 250 (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)) (cleaned up).

[3] *Ford Motor*, 141 S. Ct. at 1025 (cleaned up); *see also Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1781 (2017) ("What is needed . . . is a connection between the forum and the specific claims at issue.").

4

317 F.3d at 470 (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)). If the site is passive—it just posts information that people can see—jurisdiction is unavailable, full stop. *Id.* But if the site interacts with its visitors, sending *and* receiving information from them, we must then apply our usual tests to determine whether the virtual contacts that give rise to the plaintiff's suit arise from the defendant's purposeful targeting of the forum state. *See id.* at 472–76.

Like this lawsuit, *Revell* was an internet libel case. After deciding that the website in question was interactive, we looked to *Calder v. Jones*, 465 U.S. 783 (1984), to determine whether the publisher had targeted the alleged libel at Texas. *See Revell*, 317 F.3d at 472–76.

The key question, under *Calder*, is whether the forum state was "the focal point both of the [alleged libel] and of the harm suffered." *Calder*, 465 U.S. at 789. Thus, the *Calder* Court held that California had jurisdiction over two nonresident defendants because the alleged libel discussed "the California activities of a California resident" and "was drawn from California sources," "and the brunt of the harm" to the plaintiff "was suffered in California." *Id.* at 788–89.

Applying *Calder* in *Revell*, we dismissed for want of personal jurisdiction. The Texan plaintiff complained of an article in a Columbia University web publication that accused him of complicity in a terrorist attack. Columbia's publication was interactive, we explained, because it was "an open forum" where users could post content and interact with others. But the article never mentioned Texas, never discussed Revell's activities there, and was not aimed at Texans any more than at residents of other states. We acknowledged that the story "was presumably directed at the entire world, or perhaps just concerned U.S. citizens." *Revell*, 317 F.3d at 475. But that did not suffice. For Texas to have jurisdiction, we concluded, the article had to target Texas specifically and knowingly. *Id.* Because it did not, we lacked

jurisdiction. *Id.* at 476.

## C.

Our decision in *Revell* requires dismissal. HuffPost is interactive, but its story about Johnson has no ties to Texas. The story does not mention Texas. It recounts a meeting that took place outside Texas, and it used no Texan sources. Accordingly, we lack jurisdiction over HuffPost with respect to Johnson's libel claim.

Johnson contests that conclusion. He first claims that HuffPost's interactivity is all that matters. Once we decide that a website exchanges information with its users, he says, we must have personal jurisdiction. If HuffPost is interactive, Johnson thinks, it's irrelevant whether HuffPost targeted Texas with the alleged libel.

Johnson misreads our precedents. In *Revell*, we treated interactivity as a prerequisite to our standard jurisdictional inquiry. *See Revell*, 317 F.3d at 472. That position makes good sense. Interactivity reflects only a website's *capacity* to avail itself of a place. Sites that solicit information, purchases, and ad clicks from their viewers can more easily reach into a forum and cause injury there than can sites that do not. But just because a site *can* exploit a forum does not mean that it *has* or that its forum contacts produced the plaintiff's claim. Those requisites must be satisfied even where all the defendant's ties to the forum are virtual.[4]

Next, Johnson conjures that *Revell* is "completely different" from this case because HuffPost shows ads, sells merchandise, and offers an ad-free

---

[4] *See Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 227 (5th Cir. 2012); *see also Admar Int'l, Inc. v. Eastrock, L.L.C.*, No. 21-30098, 18 F.4th 783, ___, 2021 WL 5411010, at *2 (5th Cir. Nov. 19, 2021) (stressing that *Zippo* does not bear on whether the defendant's contacts relate to the plaintiff's claim or whether our jurisdiction is fair and reasonable).

No. 21-20022

service "on the same page as" the alleged libel. The site in *Revell*, by contrast, solicited subscriptions on "separately navigable pages."

That distinction fails for two reasons. First, Johnson never pleaded it. His amended complaint makes clear that the *only* link between the alleged libel and HuffPost's virtual contacts with Texas is that the libel "was published on the same Website." The complaint never says or suggests that we have jurisdiction because HuffPost's forum contacts sprang from the same web*page*, rather than from the same web*site*.

But even if it had, the distinction is specious. *Revell* discounted Columbia's solicitation of subscriptions because Revell's libel claim did not arise from it. "For specific jurisdiction," we explained, "we look only to the contact out of which the cause of action arises." *Revell*, 317 F.3d at 472. And Revell's claim arose only from the alleged libel, not from Columbia's inviting visitors to subscribe.[5]

Johnson also asserts that *Revell* turned on the limited interactivity of Columbia's web publication. We disagree. Though we did describe Columbia's site as having a "low level of interactivity," *Revell*, *id.* at 476 (cleaned up), we *held* that the site was interactive because it exchanged data with its visitors, *id.* at 472. We specifically rejected the contention that Columbia's website was passive and thus could not support our jurisdiction. *Id.*

Johnson has put all his eggs into the interactivity basket. But under *Revell*, interactivity isn't enough. Johnson also must show that HuffPost's

---

[5] *See Revell*, 317 F.3d at 472 ("For specific jurisdiction we look only to the contact out of which the cause of action arises—in this case the maintenance of the internet bulletin board [where the alleged libel was published]. Since this defamation action does not arise out of the solicitation of subscriptions or applications by Columbia, those portions of the website need not be considered." (footnote omitted)); *see also Clemens v. McNamee*, 615 F.3d 374, 379 (5th Cir. 2010) (noting that "the relevant contacts" for a defamation claim "are the allegedly defamatory remarks" themselves).

7

story targeted Texas in some way.  He has not done that, so he cannot prevail.

### III.

*Revell* controls this case.  But even if it did not, settled principles of personal jurisdiction command affirmance.

At bottom, the only reason to hale HuffPost into Texas is that Texans visited the site, clicking ads and buying things there.  But as far as Johnson has alleged, those visits reflect only HuffPost's universal accessibility, not its purposeful availment of Texas.  Accessibility alone cannot sustain our jurisdiction.  If it could, lack of personal jurisdiction would be no defense at all.

The defense of personal jurisdiction exists to ensure fairness to defendants and to protect federalism.  *Ford Motor*, 141 S. Ct. at 1025; *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980).  Exerting our power here would undermine both goals.

### A.

Fairness to defendants has at least two elements.  *First*, defendants must have "fair warning" that their activities could furnish jurisdiction in the forum.  *Ford Motor*, 141 S. Ct. at 1025.  That's the idea behind purposeful availment.  Where a defendant lacks suit-related ties with the forum or did not forge those ties himself, *see Diece-Lisa*, 943 F.3d at 250, he cannot reasonably expect a suit there.  *Second*, a defendant must have some chance to limit or avoid his exposure to the courts of a particular state.  *See Ford Motor*, 141 S. Ct. at 1025.  That's why a state cannot use a defendant's forum contacts—even purposeful ones—to invent jurisdiction over claims that do not relate to or arise from those contacts.

None of the alleged ties with Texas gives HuffPost fair warning that it should expect a libel suit there.  Making a website that's visible in Texas, of course, does not suffice.  *See Admar*, 18 F.4th at ____, 2021 WL 5411010, at *4.  If it could, our jurisdiction would have no limit; "a plaintiff could sue

No. 21-20022

everywhere." *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014). That result would not be fair or consistent with defendants' reasonable expectations. Grannies with cooking blogs do not, and should not, expect lawsuits from Maui to Maine.

Johnson says that HuffPost sells merchandise to Texans. But that doesn't matter. Johnson complains about a written article, not articles of clothing. Branded tees and coffee mugs have nothing to do with Johnson's libel claim, so they cannot sustain claim-specific jurisdiction.[6]

The same is true of the ads that HuffPost shows its visitors. Recall that Johnson alleged two ad-based ties with Texas. *First*, HuffPost displayed ads from Texas-based advertisers. *Second*, it used visitors' location data to tailor advertising to them. So when the site detects that a user is visiting the site from Texas, advertisers may use that data to generate a relevant ad—such as the "Attention Texas Driver!" ads that no one clicks.

The first tie is irrelevant. Johnson's libel claim arises from the story declaring him a white-nationalist Holocaust denier. It does not stem from or relate to HuffPost's ads or the citizenship of those placing them. *See Revell*, 317 F.3d at 472.

That point is clear in the context of print media. Suppose that someone advertises a truck in the classified section of a New York newspaper. The paper then calls a Texan a Holocaust denier, and that Texan sues for libel. Should our jurisdiction turn on whether the truck's owner was a citizen of Texas? Surely not. *See, e.g., Hanson v. Denckla*, 357 U.S. 235, 253–54 (1958).

The second tie has the same problem. Selling ads is no different from

---

[6] *See Bristol-Myers*, 137 S. Ct. at 1781 ("'[F]or a court to exercise specific jurisdiction over a claim, there must be an affiliation between the forum and the underlying controversy . . . . When there is no such connection, specific jurisdiction is lacking *regardless of the extent of a defendant's unconnected activities in the State*." (cleaned up) (emphasis added)).

9

No. 21-20022

hawking tees and mugs. Those sales neither produced nor relate to Johnson's libel claim. That relatedness problem remains even if HuffPost used location data to tailor ads to each visitor.

There is another barrier: The place from which a person visits Huff-Post's site is entirely beyond HuffPost's control. Johnson never says that HuffPost reached beyond the site to attract Texans to it or to the story about Johnson. He does not say, for example, that HuffPost aimed the alleged libel at Texas through geotargeted ads on Facebook or Google. Instead, he alleges only that HuffPost showed unrelated ads to those *already visiting its site.*

That point matters because "the defendant *himself*" must create the contacts that sustain the forum state's jurisdiction.[7] Because Johnson does not allege that HuffPost solicited Texan visits to the alleged libel, we cannot conclude that those visits are *HuffPost's* purposeful contacts with Texas. Instead, those visits reflect the "unilateral activity," *Hanson*, 357 U.S. at 253, of persons in Texas typing "huffpost.com" into their web browsers and pressing "Enter."

Johnson protests that ads are how HuffPost makes money. But whether HuffPost generates revenue by selling ads, tees, or chewing gum is beside the point. Johnson chose to plead a libel claim. The harm of libel is the reputational injury that results from the defendant's purposefully sharing that libel with others. *See Walden v. Fiore*, 571 U.S. 277, 288 (2014). It does not turn on whether the defendant's unrelated activities make or lose money.

What matters is whether HuffPost aimed *the alleged libel* at Texas.[8]

---

[7] *Diece-Lisa*, 943 F.3d at 250 (cleaned up); *see also Walden*, 571 U.S. at 286 ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State." (cleaned up)).

[8] *See, e.g., Clemens*, 615 F.3d at 380 ("[T]he question [is] whether McNamee's

No. 21-20022

Third-party ads on HuffPost's site reflect no such aiming. They neither caused nor relate to the harm that the story caused. They do not drive Texans to the site or even to the alleged libel. Instead, they direct Texans *away* from the site, to third-party advertisers. And HuffPost shows ads to all comers; it treats Texans like everyone else. To target every user everywhere, as those ads do,[9] is to target no place at all.[10]

We can translate that point to a physical context. Liken HuffPost's website for a physical store in New York, where HuffPost is "at home."[11] A resident of Texas visits the store, peruses the aisles, and speaks with a salesperson. She tells the salesperson that she is from Texas and describes what she would like to buy. After determining that the customer wants something that the store does not sell, the salesperson refers her to a shop down the street, earning a few cents from that shop for the favorable reference.

That interaction, if Johnson were correct, would allow a *different*

---

allegedly defamatory statements were aimed at or directed to Texas."); *Herman v. Cataphora, Inc.*, 730 F.3d 460, 465 (5th Cir. 2013) ("In applying the *Calder* analysis, we have emphasized the importance of the 'focal point' language . . . . [F]or minimum contacts to be present the allegedly defamatory statements must be adequately directed at the forum state." (citation omitted)).

[9] Johnson's own exhibits show that HuffPost collects location data from every visitor, no matter where he resides.

[10] *See Revell*, 317 F.3d at 475 ("[O]ne cannot purposefully avail oneself of 'some forum someplace'; rather, as the Supreme Court has stated, due process requires that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." (cleaned up)); *see also Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 915–18 (10th Cir. 2017).

[11] Of course, websites, like emails, are commonly understood to have no physical location at all. *Cf. Advanced Tactical*, 751 F.3d at 803. Creating a website is not like erecting billboards in all fifty states; that act cannot give every place power to hear claims about what the website displays. For that reason, it makes more sense to see a website as a physical site or store where the defendant resides. The defendant surely can expect suit there, *see Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014), and elsewhere he purposefully targets with the conduct that induces the plaintiff's suit.

Texan to sue HuffPost in Texas over a tort at the New York store. That can't be right. Of course, jurisdiction might exist if HuffPost aimed the tort at Texas in some way.[12] Or perhaps it might exist if HuffPost had reached into Texas to solicit the plaintiff's visit, without which the tort could not have occurred.[13] But absent ties of that sort—ties that link HuffPost's tort to Texas—we could not drag HuffPost to Texas to answer for it. *See, e.g.,* *Walden*, 571 U.S. at 291. Fair warning to HuffPost would be entirely absent.

Fairness also dictates that a defendant must have some chance to limit or avoid its exposure to a particular state's courts. *See Ford Motor*, 141 S. Ct. at 1025. The Supreme Court has read that principle as the inverse of the purposeful-availment requirement: Just as jurisdiction is proper when a defendant intentionally creates suit-related contacts with the forum, jurisdiction is absent where a defendant does not reach, or has ceased to reach, into the forum state in that way. *See World-Wide*, 444 U.S. at 297–99.

That principle does not require defendants to wall themselves off from the world. A hospital need not deny care to nonresident patients to avoid jurisdiction where those patients reside.[14] A resort need not bar nonresident

---

[12] *See Walden*, 571 U.S. at 287 ("[In *Calder*,] we examined the various contacts the defendants had created with California (and not just with the plaintiff) *by writing the allegedly libelous story.*") (emphasis added).

[13] *Cf. Shute v. Carnival Cruise Lines*, 897 F.2d 377, 379 (9th Cir. 1990), *rev'd on other grounds*, 499 U.S. 585 (1991). In *Shute*, a Florida cruise line advertised a Mexican cruise in Washington. A Washington resident booked the cruise, during which she suffered injuries due to the cruise line's negligence. The Ninth Circuit held that a Washington court could hear her claim because the cruise line had reached into the state to solicit the trip that allegedly injured her. *Id.* at 382. Our circuit has not endorsed *Shute*'s broad view of specific jurisdiction. *See Inmar Rx Sols. v. Devos, Ltd.*, 786 F. App'x 445, 449 n.2 (5th Cir. 2019) (per curiam).

[14] *See, e.g., Harlow v. Children's Hosp.*, 432 F.3d 50, 68–69 (1st Cir. 2005); *Frazier v. Univ. of Miss. Med. Ctr.*, No. 16-CV-976, 2017 U.S. Dist. LEXIS 161842, at *13–15 (S.D. Miss. Oct. 2, 2017) (same).

No. 21-20022

travelers to avoid jurisdiction in their home states when those travelers eat tainted food at the resort, take ill, and sue after returning home.[15]  Likewise, HuffPost need not block Texans from visiting its site, receiving relevant advertising, or buying T-shirts to escape the ability of Texas courts to hear Johnson's libel claim.

Instead, that principle means that HuffPost may avoid the authority of Texas's courts by not purposefully directing at Texas the conduct that produced Johnson's suit.  Because HuffPost did not aim the alleged libel at Texas or reach into Texas to share it there, we cannot hear Johnson's libel claim.

### B.

Limits on personal jurisdiction also protect interstate federalism.  *Ford Motor*, 141 S. Ct. at 1025.  Hearing Johnson's claim would undermine that.

Personal jurisdiction comes in two flavors: general and specific. Unlike claim-specific jurisdiction, general jurisdiction does not demand that the plaintiff's claims arise from the defendant's forum ties.  *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  But for a state to have the power to hear claims against a defendant, the defendant's ties with the state must be so pervasive that he is "essentially at home" there. *Id.*  That is a high bar, which Johnson concedes he cannot meet.

Claim-specific jurisdiction is different.  As we have explained, it may arise only from the defendant's forum ties that relate to the plaintiff's claim. One reason for that limit is to respect federalism.  When one state tries a suit, it "may prevent sister States from exercising their like authority," even when those states have a greater interest in the dispute.  *Ford Motor*, 141 S. Ct. at 1025 (cleaned up).

---

[15] *See, e.g., Moon v. Sandals Resorts Int'l, Ltd.*, No. 13-cv-00134, 2013 U.S. Dist. LEXIS 203230, at *10–11 (W.D. Tex. Dec. 27, 2013).

13

That federalism interest carries enormous weight. It may preclude our power even when all other factors—the burden on the defendant, the forum state's interest in applying its own law, and the convenience of the forum—strongly favor our jurisdiction.[16]

Exercising jurisdiction over HuffPost would collapse the distinction between specific and general jurisdiction. If marketing ads, merchandise, and ad-free experiences to all visitors can create jurisdiction over a website with respect to an unrelated libel claim, we can imagine few claims against a website that would fall beyond the reach of "claim-specific" jurisdiction.[17]

Erasing the line between specific and general jurisdiction as Johnson proposes would vitiate the sovereign interests of the states where defendants like HuffPost are "at home." General jurisdiction for every state where Huff-Post is visible would destroy its meaning for HuffPost's home states, to whom that awesome power is properly reserved.[18] If Johnson wants to sue HuffPost without showing that HuffPost aimed its suit-related conduct at the place where he sues, he may sue HuffPost in Delaware or New York, where the site is at home. *See Bristol-Myers*, 137 S. Ct. at 1783.

---

[16] *See World-Wide*, 444 U.S. at 293–94; *see also Bristol-Myers*, 137 S. Ct. at 1780–81; *Ford Motor*, 141 S. Ct. at 1025.

[17] It is not even clear that Johnson's theory would limit Texas's power to claims that arise from HuffPost's website. Suppose that a HuffPost employee, while chasing down a story outside Texas, crashes his car into a citizen of Texas. Could that victim sue Huff-Post in Texas? Under Johnson's theory, we see no reason why he could not. If selling tees and mugs to Texans can support our jurisdiction over HuffPost with respect to a libel claim unrelated to those items, that virtual activity likewise could sustain our power to hale Huff-Post to Texas to answer for a physical tort that harms a Texan elsewhere.

[18] *See Ford Motor*, 141 S. Ct. at 1025 ("One State's sovereign power to try a suit, we have recognized, may prevent sister States from exercising their like authority." (cleaned up)); *cf.* THE INCREDIBLES (Walt Disney Pictures 2004) ("SYNDROME: 'And when everyone's super, . . . no one will be.'").

No. 21-20022

## IV.

The well-crafted dissent says we have disregarded binding precedent "because we disagree with its policy implications" for our increasingly virtual world. To the contrary, we apply longstanding, uncontroversial limits on personal jurisdiction. We may not discard those limits just because the defendant operates a website.[19] Yet the dissent, we fear, would strip the shields of relatedness and purposeful availment from virtual defendants.

## A.

Let's turn first to relatedness. Our distinguished dissenting colleague posits that *Ford Motor* would authorize our jurisdiction here: *Ford Motor* "made clear that the state in which an injury occurred can exercise specific personal jurisdiction over a defendant if the defendant deliberately engaged in commercial activities in that state."

Though *Ford Motor* did reject a strict causal theory of relatedness, it did not say that "anything goes." *Ford Motor*, 141 S. Ct. at 1026. Quite the contrary. For specific jurisdiction, a plaintiff must link the defendant's *suit-related* conduct to the forum. Mere market exploitation will not suffice.

Review *Ford Motor*'s facts. Ford regularly advertised, sold, and serviced cars in Montana and Minnesota. Customers in each state sued after their Ford cars injured them. Though Ford sold those car models in both states, Ford claimed that those sales did not relate to the plaintiffs' claims because it had sold in *other* states the *specific* cars that injured the plaintiffs. In other words, Ford demanded a strict causal link between the forum states and the plaintiffs' cars. *See id.* at 1022–24.

---

[19] *See Admar*, 18 F.4th at ___, 2021 WL 5411010, at *2 ("The analysis applicable to a case involving jurisdiction based on the Internet should not be different at its most basic level from any other personal jurisdiction case." (cleaned up)).

No. 21-20022

After rejecting that unduly narrow view, the Court stressed that the plaintiffs still had to show that Ford's forum contacts related to their claims. The plaintiffs did show that, the Court said, because Ford sold the injurious models in Montana and Minnesota.[20] That link—between the products that injured the plaintiffs and Ford's selling those products in the forum states—supported specific jurisdiction.[21]

*Ford Motor* does not say, as the dissent suggests, that *any* "commercial activities in a state" support specific jurisdiction over a defendant there. The only relevant activities of the defendant are those that relate to the plaintiff's suit. That crucial link is missing here. Johnson contends that HuffPost's unrelated activities—selling merch and showing ads to every visitor—can support personal jurisdiction over HuffPost with respect to his libel claim. That, *Ford Motor* shows, is a bridge too far.

### B.

Next, the dissent insists that *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), dictates that we have personal jurisdiction over HuffPost. But woodenly applying *Keeton* to internet publications, as the dissent suggests, would vitiate the requirement that a defendant purposefully avail himself of the forum state before he may be haled into court there.

*Keeton*, a libel case, authorized specific jurisdiction over Hustler Magazine in New Hampshire because it mailed tens of thousands of libelous magazines there. The instant dissent thinks this case is much the same. HuffPost

---

[20] *See Ford Motor*, 141 S. Ct. at 1028 ("Ford had systematically served a market in Montana and Minnesota *for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States.*" (emphasis added)).

[21] *Id.*; *see also id.* at 1030 ("An automaker regularly marketing a vehicle in a State . . . has 'clear notice' that it will be subject to jurisdiction in the State's courts when the product malfunctions there . . . ." (quoting *World-Wide*, 444 U.S. at 297)).

No. 21-20022

is a publisher too, she explains, and "has fulsome circulation in Texas"; that should resolve this case. The fact that HuffPost has a website, rather than a print magazine, she says, should not matter a whit.

We agree with that last observation. Our personal-jurisdiction inquiry should not change just because a defendant operates a web publication instead of a physical one. *See Admar*, 18 F.4th at ___, 2021 WL 5411010, at *2. But that's why we cannot transpose *Keeton* to the Internet without invoking first principles. Like *Calder* and the rest of the Court's specific-jurisdiction cases, *Keeton* applied the requisites of specific jurisdiction— purposeful availment, relatedness, and fairness to defendants—in a particular context. It did not forge an iron law of specific jurisdiction for all publishers in all mediums.

*Keeton* stressed the substantial physical circulation of print media because that reflects purposeful availment of the forum state. *See Walden*, 571 U.S. at 285 (noting that *Keeton* addresses a defendant's "physical entry" into the forum). Sending tens of thousands of magazines to a state is an affirmative act that displays the publisher's specific intent to target that state with what the magazines contain. That's why *Keeton* concluded, 465 U.S. at 781, that Hustler had "continuously and deliberately exploited the New Hampshire market" by sending magazines there. That also explains why the *Keeton* Court had no trouble linking Hustler's suit-related conduct to New Hampshire.[22]

The challenge here, which the dissent does not squarely confront, is that websites are different. To circulate a print magazine, the publisher must send it somewhere. But websites are "circulated" to the public by virtue of

---

[22] *Cf. Calder*, 465 U.S. at 790 ("An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.").

No. 21-20022

their universal accessibility, which exists from their inception. That's why clicks, visits, and views from forum residents cannot alone show purposeful availment. They are not evidence that "the *defendant* has formed a contact with the forum state." *Advanced Tactical*, 751 F.3d at 803.

We again stress that Johnson pleaded no facts showing that HuffPost aimed the alleged libel or its website at Texas. Johnson identifies only one link to Texas that relates to the dispute before us: the fact that HuffPost's website and the alleged libel are visible in Texas. But mere accessibility cannot demonstrate purposeful availment, as we and our sister circuits have held many times.[23] Though HuffPost's site shows ads and sells merchandise, neither act targets Texas specifically. And even if those acts did target Texas, neither relates to Johnson's claim, so neither supports specific jurisdiction.[24]

At bottom, the dissent urges that we have power over HuffPost because it erected a website where Texans can visit and click ads. Accepting that position would give us unlimited jurisdiction over virtual defendants—and not just our cooking-blog granny. A rising YouTube star enables advertising on his channel, then libels someone in a video he posts there. If the dissent is right, all fifty states may hale him into court to answer for it. But our law is clear that more is needed to protect due process. How much more is a question for another day.

---

[23] *See, e.g.*, *Admar*, 18 F.4th at ____, 2021 WL 5411010, at *4 ("Merely running a website that is accessible in the forum state does not constitute the purposeful availment required to establish personal jurisdiction . . . ."); *id.* at *3 (collecting cases from three other circuits).

[24] *Cf. Keeton*, 465 U.S. at 779–80 ("[Hustler's] activities in the forum may not be so substantial as to support jurisdiction over a cause of action unrelated to those activities. But [Hustler] is carrying on a 'part of its general business' in New Hampshire, and that is sufficient to support jurisdiction *when the cause of action arises out of the very activity being conducted, in part, in New Hampshire*." (emphasis added) (footnote omitted)).

No. 21-20022

## V.

Having failed to plead an adequate basis for our jurisdiction, Johnson asks us to let him fish for facts to support it. We will not.

To merit jurisdictional discovery, Johnson must show that it is "likely to produce the facts needed to withstand" dismissal. *Davila v. United States*, 713 F.3d 248, 264 (5th Cir. 2013) (cleaned up). He must make clear which "specific facts" he expects discovery to find. *Bell Helicopter Textron, Inc. v. Am. Eurocopter, LLC*, 729 F. Supp. 2d 789, 797 (N.D. Tex. 2010). We will not authorize "a jurisdictional fishing expedition" based on a plaintiff's general averments that more discovery will prove our jurisdiction. *Id.* at 798.

The district court denied jurisdictional discovery; we review that ruling for abuse of discretion. *Davila*, 713 F.3d at 264. Johnson has not met his burden. He has not alleged specific facts that discovery will prove. Instead, he says that discovery would determine "the extent" of the activities that we already have said cannot support jurisdiction. We see no reason to confirm Johnson's allegations with discovery when they cannot sustain our power as a matter of law. *See Seiferth*, 472 F.3d at 277.

\* \* \* \* \*

The Constitution permits specific jurisdiction only where the defendant himself purposefully creates the forum contacts from which the plaintiff's claims arise. And as to a libel claim, a website selling ads, merchandise, and ad-free experiences to all comers is not enough.

AFFIRMED.

19

No. 21-20022

HAYNES, *Circuit Judge*, dissenting:

Just this year, the Supreme Court made clear that the state in which an injury occurred can exercise specific personal jurisdiction over a defendant if the defendant deliberately engaged in commercial activities in that state. *Ford Motor Co. v. Mont. Eighth Jud. Dist.*, 141 S. Ct. 1017, 1025–27 (2021). Earlier decisions followed that same path. *See, e.g., Daimler AG v. Bauman*, 571 U.S. 117, 127 n.5 (2014); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1990); *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 112 (1987).

This case involves a Texas citizen (Johnson) who claims to have been libeled by TheHuffingtonPost.com, Inc. ("HuffPost"), bringing suit in Texas.[1] As a citizen of Texas, Johnson, of course, suffered injury in Texas as a result of his citizenship there. The question then becomes what connection HuffPost has to Texas relative to this incident. The majority opinion finds no sufficient connection. Concerned about the expansion of personal jurisdiction in the age of digital media, the majority opinion ignores the Supreme Court's recent decision in *Ford Motor*. Worse, the majority opinion all but nullifies the Supreme Court's decision in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), and our own court's decision in *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419 (5th Cir. 2005).

The reality of the modern world is that printed newspapers are far less common than virtual ones. But just as we are bound to apply constitutional provisions to modern situations—often, unimaginable to the founders—we are bound to apply Supreme Court and circuit precedent. Therein lies my disagreement with the majority opinion. Because I believe that modernity

---

[1] Obviously, we do not know the actual truth of the facts asserted here, but I will assume the plaintiff's claims to be valid for purposes of the jurisdictional analysis.

No. 21-20022

does not excuse our obligation to apply existing legal frameworks, I respectfully dissent.

To be subject to specific personal jurisdiction in Texas, HuffPost must have "purposefully avail[ed]" itself of the benefits of conducting activities in Texas, and Johnson's claim must "arise out of or relate to" those activities. *Ford Motor Co.*, 141 S. Ct. at 1025 (quotations omitted).

But how do we analyze the virtual world instead of the physical automobiles at issue in *Ford Motor*? In *Mink v. AAAA Development LLC*, 190 F.3d 333 (5th Cir. 1999), our court adopted the *Zippo* test for determining personal jurisdiction over websites. *Id.* at 336. *Zippo* categorized websites into three types:

> (1) websites that merely passively advertise—which categorically do not establish personal jurisdiction;
>
> (2) websites that facilitate contracting and repeated file transfers—which categorically do; and
>
> (3) websites with other degrees of user interaction—which can go either way, depending on the "level of interactivity" and the "commercial nature of the exchange."

*Id.* (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)).

I agree with the majority opinion that the HuffPost website falls under *Zippo* category three, requiring us to determine the level of interactivity, which in turn requires us to assess specific personal jurisdiction as it relates to the alleged libel itself. *See Revell v. Lidov*, 317 F.3d 467, 470–76 (5th Cir. 2002). There are two ways to do that. As we explained in *Fielding*:

> Specific jurisdiction for a suit alleging the intentional tort of libel exists for (1) a publication with adequate circulation in the state, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 773–74 (1984), or (2) an author or publisher who "aims" a story at the

21

state knowing that the "effects" of the story will be felt there.
*Calder v. Jones*, 465 U.S. 783, 789–90 (1984).

415 F.3d at 425. So, our precedent requires an examination of the differences between *Keeton* and *Calder*.

In *Keeton*, the plaintiff sued Hustler Magazine in New Hampshire over an allegedly libelous article. 465 U.S. at 772. The plaintiff was a New York citizen; Hustler Magazine was "an Ohio corporation with its principal place of business in California." *Id.* The article had nothing to do with New Hampshire, and the plaintiff's "*only* connection with New Hampshire was the circulation of Hustler Magazine in the state." *Id.* (emphasis added). So why'd she sue in New Hampshire? Because New Hampshire had an "unusually long statute of limitations," making it "the only State where petitioner's suit would not have been time-barred when it was filed." *Id.* at 773, 775. Put another way, the case had nothing to do with New Hampshire, and, unlike this case, New Hampshire didn't even have an interest in hearing the case due to an injury to one of its citizens. Seeing such an inconsequential connection to the forum, the First Circuit affirmed dismissal for lack of personal jurisdiction, explaining that "the New Hampshire tail is too small to wag so large an out-of-state dog." *Id.* at 772.

The Supreme Court reversed. Its decision turned on the following facts: Hustler Magazine circulated between 10,000 and 15,000 copies of its magazine in New Hampshire per month, and that circulation was not "random, isolated, or fortuitous"—it was purposeful. *Id.* at 772–74. Jurisdiction over Hustler Magazine was therefore appropriate, the Court held, because "regular circulation of magazines in the forum State is sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine." *Id.* at 773–74. As for fairness to the defendant, the Court saw no concern: "Certainly Hustler Magazine, Inc., which chose to enter the New Hampshire market, can be charged with knowledge of its laws and no doubt would have claimed the benefit of them if it had a

complaint against a subscriber, distributor, or other commercial partner." *Id.*
at 779. When a publication "continuously and deliberately exploit[s] [a]
market, it must reasonably anticipate being haled into court there in a libel
action based on the contents of its magazine." *Id.* at 781. This analysis
sounds very similar to that of *Ford Motor*, albeit a different form of
"exploitation of a market."

On the same day it decided *Keeton*, the Supreme Court issued a
jurisdictional decision in another libel case, *Calder*. Again, the Court held
that specific personal jurisdiction existed, but for a very different reason.
Jones, the plaintiff, sued the National Enquirer, its local distributing
company, and two employees of the Enquirer in California over an allegedly
libelous article. *Calder*, 465 U.S. at 785–86. Jones was a California resident,
the National Enquirer was a Florida corporation with its principal place of
business in Florida, and the employees were both Florida residents. *Id.*

Circulation of the Enquirer in California was certainly substantial—
the Enquirer circulated 600,000 copies every week, "almost twice the level
of the next highest State." *Id.* at 785. But the Court fashioned a different
test: Specific personal jurisdiction was appropriate if the effects of
defendants' conduct are felt in the forum state. The Court explained:

> The allegedly libelous story concerned the California activities
> of a California resident. It impugned the professionalism of an
> entertainer whose television career was centered in California.
> The article was drawn from California sources, and the brunt
> of the harm, in terms both of respondent's emotional distress
> and the injury to her professional reputation, was suffered in
> California. In sum, California is the focal point both of the
> story and of the harm suffered. Jurisdiction over petitioners is
> therefore proper in California based on the "effects" of their
> Florida conduct in California.

*Id.* at 788–89 (footnote omitted).

No. 21-20022

Why the different outcomes? Well, the Court faced an entirely different situation in *Calder* than it did in *Keeton*. In *Calder*, the National Enquirer (the publication in which the libel was printed) didn't contest jurisdiction. *Id.* at 785. Instead, the two *employees* who authored the statement and approved its publication objected to personal jurisdiction, and the Court explained that "their contacts with California" could not "be judged according to their employer's activities there." *Id.* at 785–86, 789–90. Put differently, because personal jurisdiction requires an assessment of a defendant's relationship to the forum, the nature of the defendant matters when deciding whether the requirements of personal jurisdiction are satisfied, and an author's connections to a state will inherently be different than a publication's connections.

Indeed, that is exactly what our court in *Fielding* recognized: that the Supreme Court articulated two different rules that turned on the nature of the defendant in a libel case. *See* 415 F.3d at 425. If the defendant alleging lack of personal jurisdiction is a publication (like Hustler Magazine in *Keeton*), then personal jurisdiction is appropriate when that publication is in "substantial circulation" and that circulation is not "random, isolated, or fortuitous." *See id.* (quotation omitted). If the defendant alleging a lack of personal jurisdiction is the author or the individual approving publication (like the employees in *Calder*), then personal jurisdiction is appropriate when the effect of the defendant's conduct is felt in the forum state. *See id.*

Note that the Court could not have reached its decisions in both *Keeton* and *Calder* if these two different rules did not exist. If only the *Keeton* substantial circulation test existed, then *Calder* makes no sense—how can two people be in "substantial circulation"? If only the *Calder* effects test existed, then *Keeton* was wrongly decided—again, the article had absolutely nothing to do with New Hampshire. Each test addressed a different situation.

No. 21-20022

I now address how these precedents apply in our case. Johnson sued HuffPost, a publication, *not* the author of the article.[2] The *Keeton* test therefore applies. HuffPost has fulsome circulation in Texas, and its presence in Texas was not "random, isolated, or fortuitous." Far from it: HuffPost actively exploited the forum through Texas-specific advertising. As in *Keeton*, HuffPost "continuously and deliberately exploit[s]" the Texas market, so it should not be surprised if it is "haled into court there" for allegations of libel. 465 U.S. at 781. As in *Keeton*, it doesn't matter that the article did not expressly address Texas. As in *Keeton*, jurisdiction exists.

Other precedents do not mandate a different outcome. In *Clemens v. McNamee*, 615 F.3d 374 (2010), *Calder* was applied because the defendant was the author of the allegedly defamatory statement (Brian McNamee)—not the publication (Sports Illustrated). *See id.* at 377, 379. The same was true in *Herman v. Cataphora, Inc.*, 730 F.3d 460 (5th Cir. 2013). The defendants were the author of the allegedly defamatory statement (Roger Chadderdon) and his employer (Cataphora, Inc.); not the publication (Above the Law). *Id.* at 462–65.

*Revell* involved a different factual scenario. As explained above, the facts of *Keeton* do not arise in every libel case. *Keeton* applies when: (1) the defendant is a publication; (2) the publication has substantial circulation in the state; and (3) that circulation isn't "random, isolated, or fortuitous" (i.e., the publication must have *meant* for that substantial circulation to happen in that state). 465 U.S. at 772–74. So when an online bulletin board post at Columbia University is just accessed by a Texas resident (as was the case in *Revell*), *Keeton* plainly didn't apply. *Revell*, 317 F.3d at 469. *Revell* makes no

---

[2] The byline of the article lists Andy Campbell as the author, not HuffPost. *See* Andy Campbell, *2 GOP Lawmakers Host Chuck Johnson, Holocaust-Denying White Nationalist*, HUFFPOST (Jan. 17, 2019), https://www.huffpost.com/entry/gop-reps-host-chuck-johnson-holocaust-denying-white-nationalist_n_5c40944be4b0a8dbe16e670a.

No. 21-20022

mention that the bulletin board was in "substantial circulation" in Texas, and even if it was, there's nothing to suggest that Columbia meant it to be, unlike here where HuffPost happily makes money advertising Texas-specific goods and services. *Keeton* did not apply because mere accessibility of a publication cannot trigger it.

Unfortunately, the majority opinion does not once cite to *Fielding* and applies "first principles" to contend that *Keeton* is limited to a bygone era. It insists that only *Calder* is a relevant precedent. Is it accurate to limit *Keeton* to print publications while applying *Calder* to websites? Of course not. *Calder* and *Keeton* both involved print publications, not websites in the 1984 era when websites for the vast majority of people were non-existent and largely unknown. We cannot, then, say that one decision from the pre-website era applies in modern times while the other doesn't.

On the surface, the majority opinion seems to agree, twice citing to a recent Fifth Circuit case for the proposition that "[t]he analysis applicable to a case involving jurisdiction based on the Internet should not be different at its most basic level from any other personal jurisdiction case." *Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, ___ (5th Cir. 2021). But then it confusingly contends that the dissenting opinion fails to "squarely confront . . . that websites are different." Majority Op. at 18.

But neither our own court nor our sister courts have distinguished *Keeton* on the grounds that "websites are different." In fact, the First, Second, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have all analyzed *Keeton* in cases concerning the internet—none have restricted application of *Keeton* to print publications.[3] As the Tenth Circuit observed:

---

[3] *See, e.g., Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 10–11 (1st Cir. 2018); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 241, 243 (2d Cir. 2007); *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 427–28 (7th Cir. 2010); *Steinbuch v. Cutler*, 518 F.3d 580, 584, 586

26

No. 21-20022

"Some circuit courts have applied the *Keeton* analysis in cases where the out-of-state defendant's *only* contacts with the forum state occurred over the internet . . . ." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 906 (10th Cir. 2017) (emphasis added).

If the majority opinion restricts *Keeton* in such a way, it would be creating a circuit split. It would also impose the very causal requirement that the Supreme Court so recently rejected. Nominally, the majority opinion recognizes that it must adhere to *Ford Motor*, but in actuality, the majority opinion seems to suggest that only if the (extensive) Texas-based advertising *caused* the lawsuit might there be jurisdiction. *See* Majority Op. at 9 ("It does not stem from or relate to HuffPost's ads or the citizenship of those placing them.").

In addition to ignoring the fact that there was no causation in *Keeton* either (there was nothing tying New Hampshire to the libel), the majority opinion overlooks just how close this case is to *Ford Motor*. Just like Ford, HuffPost regularly sold its products and advertised in the forum state. Just like Ford, a consumer of HuffPost's core product (the newspaper) was injured by that product. Ford claimed that because it did not make the specific cars that led to injury in Montana or Minnesota, it shouldn't be subject to litigation in Montana or Minnesota. Similarly, HuffPost argues that because it did not write the specific article that contains the alleged libel in Texas, it shouldn't be subject to litigation in Texas. The Court rejected that argument in *Ford Motor* because, as the majority opinion explains: "That link—between the products that injured the plaintiffs and Ford's selling those products in the forum states—supported specific jurisdiction." Majority Op. at 15–16 (footnote and citation omitted). We should reject HuffPost's

_____

(8th Cir. 2008); *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 977, 981 (9th Cir. 2021); *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 900, 914–15 (10th Cir. 2017); *Licciardello v. Lovelady*, 544 F.3d 1280, 1285–86 (11th Cir. 2008).

No. 21-20022

argument for that same reason: That link—between the article that injured Johnson (who is in Texas) and HuffPost purposely circulating articles to Texas—supports specific jurisdiction.

There also appears to be some confusion regarding the position this dissenting opinion takes. The majority opinion incorrectly suggests that my "position would give us unlimited jurisdiction" because the only connection HuffPost has in Texas is that "Texans can visit [it] and click ads." Majority Op. at 18. That's not at all my position. Here, HuffPost is purposefully in wide circulation in Texas and specifically targets Texans with Texas-specific ads. Thus, we should not, and I do not, consider the issue of jurisdiction over a similar company spouting only generalized, national-level advertisements (though, again, *Keeton* did not involve New Hampshire–specific materials).

Yet, the majority opinion ignores that distinction. "Grannies with cooking blogs," the majority opinion warns, "should not, expect lawsuits from Maui to Maine." At this point, we're talking in circles. HuffPost is not a "grannie" with a passive "cooking blog." It's a publication. Of course, there must be some relatedness for personal jurisdiction. But there is, here. HuffPost is not accidentally found in Texas but is actively seeking Texas readers and, more importantly, the money from advertising to them. It benefits from its Texas readership through money made off of Texas-specific advertising; if it does so in Maui as well, so be it. It is not an accident that Texans can access HuffPost, and the approach HuffPost takes towards Texas is the modern equivalent of Keeton sending magazines to New Hampshire. This case does not involve the individual author or a "grannie" who talks virtually to her friends in other states.

Finally, even if the majority opinion is correct that restricting personal jurisdiction would be beneficial as a policy matter, I do not believe that federal circuit judges are policymakers, and we certainly do not get to disregard precedent because we disagree with its policy implications. I recognize and

No. 21-20022

agree that federal courts are courts of limited jurisdiction. But as judges on this court, we must follow Supreme Court precedent and our own precedents under the rule of orderliness, whether we like them or not. *See Jacobs v. Nat'l Drug Intell. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("[E]ven if a panel's interpretation of the law appears flawed, the rule of orderliness prevents a subsequent panel from declaring it void."). Accordingly, we are bound to apply *Ford Motor*, *Keeton*, and *Fielding*. Based on the relevant precedent, I would vacate the district court's dismissal and remand for further proceedings. Because the majority opinion fails to do so, I respectfully dissent.